## McCurdy *versus* Myers.

### *Power of Stockholder over Assets of Corporation.*

1. A majority of the stockholders of a corporation have power to dissolve it; but they cannot dispose of or exchange the interest of a stockholder in its assets without his consent.

2. Where the shareholders of an insurance company had given mortgages to the company to secure a portion of their capital, to be held by the company as security and allotted by assessment *pro rata* among the stockholders for deficiencies, &c., and one of them died, having devised the estate covered by his mortgage to his widow: *Held*, That the insurance company could not, under an agreement with another corporation to assign certain of these mortgages and receive an equivalent in the stock of the assignee, or assign the mortgage of the deceased so as to enable the assignee to recover on it, there being no proof that the devisees of the mortgagor had assented to the transfer or to the terms on which it was made.

ERROR to the Common Pleas of *Bradford county.*

This was a *scire facias*, at the suit of John R. McCurdy against Sarah Myers, executrix and devisee of William Myers, deceased, on a mortgage given by him, September 28th 1855, to The Farmers' Union Insurance Company of Athens, in which there was a verdict and judgment for defendant.

The facts of this case are so clearly stated in the opinion of this court that no other statement is necessary.

*J. C. Adams*, for plaintiff.

*Bentley* and *Fitch*, for defendants.

The opinion of the court was delivered, May 6th 1863, by
READ, J.—The Farmers' Union Insurance Company was incor-

porated by an Act of Assembly, passed the 13th of April 1853, P. L. 389. The operations, business, and office of the company were to be carried on at the borough of Athens, in the county of Bradford. The business of the company was conducted on the plan of mutual insurance, with the right of adding to the capital of said company a sum not less than $50,000 nor more than $200,000, and of managing the same separate and apart from the mutual business of the company, and the board of directors "may at such time thereafter, as the majority of them shall by resolution determine, unite a cash capital as aforesaid, pursuant to the provisions of the act, as a farther and additional security to the insured in said company beyond the funds thereinafter provided for." The time, terms, and mode of increasing the cash capital, and requiring payments thereof, were to be fixed by the directors in a manner not inconsistent with the law and the charter.

The directors having determined to raise a capital of $200,000, resolved that one-half should be secured by bond, and one-half by bond and mortgage, and opened a subscription book, containing in it the following clause : "To pay in the same as may be required and necessary to the payments of all losses and expenses of said company not otherwise provided for, and in the manner as that was or may hereafter be required by the charter and by-laws of the said company." This was subscribed by all the shareholders, and amongst others by William Myers, on the 30th August 1855. The mortgage given by William Myers to the company was dated 28th September 1855, to secure the payment of his bond for $10,000 of same date, conditioned to pay $5000 on demand, with interest from 1st October 1855, payable on 1st October 1856, and annually thereafter.

It was clearly understood, at the time of giving the mortgage, that "if it were necessary to collect anything on the mortgages it would be collected on their whole stock of $200,000. Each man to pay in proportion to the stock he had." This was put into the shape of a resolution passed by the board of directors. "That the bonds and mortgages were to be held as security, but not to be allotted only by assessment *pro rata*, for the payment of fines in case of a deficiency of premiums to meet the demands against the company, by assessment made upon the stock of the company."

The stock company was organized and went into operation on the 1st of January 1856, and at the commencement of 1859, it would appear, that negotiations were pending between the directors of this company and those of the Great Western Insurance and Trust Company of Philadelphia, for the transfer of certain first mortgages of the former to the latter for $100,000 of the stock of the latter company. In the course of these negotiations a statement was handed in on the 21st February by the

[McCurdy *v.* Myers.]

Great Western of their condition, to the committee of the Farmers' Union, showing a favourable state of their affairs, whilst they had in their possession an entirely different statement, taken from and corresponding with their books.   This statement was never known by the Farmers' Union, nor discovered by those who had represented it, until March 1860, when the Western Insurance Company had failed.

In the statement exhibited to the committee of the Farmers' Union, the aggregate amount of assets was $264,942.34, and the liabilities $65,054.88.   There was no balance struck, and the capital stock remaining was there represented as $220,500, and was not represented as part of the assets on the paper.   In the other statement the assets appeared to be $180,207.47, and the liabilities of the company $77,318.81.   The interest in the brown-stone building, as represented to the committee, was put at $53,000, whilst in this statement it was represented as $11,000.

Under these circumstances, the board of directors of the Farmers' Union Insurance Company, on the 8th March 1859, passed two resolutions.   The first to unite with the Great Western Insurance and Trust Company of Philadelphia, and authorizing the president and secretary to make a subscription of $100,000 to the stock of the said company, and to transfer in part therefor $100,000 of their first mortgages, and to transfer certain assets therein specified, consisting of amount in hands of agents, notes for premiums, cash that may be in hand and in bank, and certain mortgages, upon condition that the Great Western assume all liabilities except the debts of the Waverly Bank, and reinsure all their outstanding risks.   The second resolution was in case the arrangement was effected, and the companies became merged, then the $100,000 mortgages transferred "are to remain in the hands of the Great Western Insurance and Trust Company, and shall only be collected in assessments regularly made for the liabilities of the said company, *pro rata* with the whole amount of the stock held by said company."

Under the same date, and immediately following these resolutions, is the "assent of stockholders," which contains this clause: "Our assent is hereby given to the above arrangement and union of interests with the Great Western Insurance and Trust Company, with the understanding that the same is to be agreed to by all and each of the stockholders of the Farmers' Union Insurance Company."

On the 14th March 1859, an agreement was signed and executed by the president and secretary of each company, merging the charter and all the corporate rights and franchises of the Farmers' Union Insurance Company in the Great Western Insurance and Trust Company.   The mortgages were transferred

[McCurdy *v.* Myers.]

to the Great Western, including the bond and mortgage of William Myers, and which were subsequently assigned to John R. McCurdy, a director of the Great Western, and entirely cognisant of all these transactions, thus taking the said securities with full notice. He stood, therefore, in the shoes of the Great Western, who had no other rights than those of the Farmers' Union over the bond and mortgage, the subject of the present suit.

William Myers died in March 1856, leaving his widow his executrix and devisee, who thus became a shareholder of the Farmers' Union Insurance Company, and indebted as the holder and owner of the mortgaged premises upon the same terms and to the same extent only as her husband was to that company. Her defences therefore to this suit were the terms of the original subscription, and the subsequent resolution under which the mortgage was received by the Farmers' Union, the terms of the resolutions of the 8th of March 1859, and the fraud practised by which they had been obtained, and the assent of the same date, which was invalid, unless signed by all and each of the stockholders, and the undoubted fact that it never was signed by her, a stockholder, or directly or indirectly assented or agreed to by her in any way whatever.

The court below, however, placed it upon the impregnable ground that she never assented to the transfer, or to any of the terms upon which it was made. The opinion of the learned president judge states the law on this point so forcibly and clearly that it is unnecessary to do more than to say

The judgment is affirmed.